<u>**NOT FOR PUBLICATION**</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW JERSEY, | : : : | Civil Action No. 03-4625 |
| Plaintiffs, | : : | **OPINION** |
| v. | : : | |
| SUNOCO, INC. (R&M), | : : | |
| Defendant. | : | |

**Appearances:**

    Annette M. Lang, Esquire
    Katherine Mayer, Esquire
    United States Department of Justice
    PO Box 7611
    Washington, DC 20044-7611

    Leslie A. Kirby-Miles, Esquire
    United States Environmental Protection Agency
        Attorneys for Plaintiff United States of America

    Scott B. Dubin, Esquire
    Department of Law and Public Safety
    Division of Law
    PO Box 93
    Trenton, New Jersey 08625-0093
        Attorney for Plaintiff State of New Jersey

    Raymond N. Pomeroy, II, Esquire
    Robert Brager, Esquire
    Amy M. Lincoln, Esquire
    Beveridge & Diamond, P.C.
    26 Franklin Street
    Tenafly, New Jersey 07670-2515
        Attorneys for Defendant

**RODRIGUEZ**, **Senior United States District Judge.**

This matter comes before the Court on Defendant, Sunoco, Inc.'s, Petition Objecting to Plaintiffs United States of America's and State of New Jersey's Position Letter under the Dispute Resolution Provisions of the Eagle Point Consent Decree [Docket No. 8] and on Plaintiffs United States of America's and State of New Jersey's Motion to Enforce the Consent Decree and for Additional Injunctive Relief [Docket No. 10]. For the reasons stated herein the motion will be granted in part, denied in part and dismissed without prejudice in part.

## I. BACKGROUND

Plaintiffs, United States of America, on behalf of the Environmental Protection Agency ("EPA"), and State of New Jersey ("New Jersey"), on behalf of the New Jersey Department of Environmental Protection ("NJDEP") (collectively referred to as "governments"), brought this action against Plaintiff Sunoco, Inc. ("Sunoco") to enforce a Consent Decree entered by this Court on December 2, 2003. (Pl. Br., p. 17.) The Consent Decree was entered into as a settlement agreed upon in October of 2003, regarding emissions from petroleum refineries.[1]  Id.  The purpose of the Consent Decree was to resolve claims under the Clean Air Act for violations occurring at the Eagle Point Refinery in Westville, New Jersey.  Id.  Among other things, the injunctive relief that

---

[1] The goal of the settlement was to reduce air emissions by more than 3,900 tons. (Pl. Br., p. 17.)

Coastal Eagle Point Oil Company ("CEPOC") agreed to in the Consent Decree was to control emissions from its flaring devices by complying with the applicable requirements of 40 C.F.R. Part 60, Subparts A and J (the "New Source Performance Standards" ("NSPS") for petroleum refineries).  Id.  The NSPS applicability and the compliance with emissions limit information was contained in paragraphs 37 and 38(a) of the Consent Decree.  CEPOC had to comply with these requirements within twenty-one months, or by June 30, 2005.  (Opp'n, p. 3.)  On April 30, 2003, Sunoco ("Defendant") announced its intention to purchase the Eagle Point Refinery and on January 13, 2004, Defendant acquired it and took over operations.  (Pl. Br., p. 17.)  Defendant agreed to assume all of the obligations of the Consent Decree and in March of 2004 Sunoco was substituted for CEPOC as Defendant.[2]  (Opp'n, pp. 5-6.)

The Consent Decree made three options available to Defendant to control the emissions of the flaring devices: (1) operate a flare gas recovery system ("FGRS"); (2) eliminate the routes by which non-emergency gas streams reached a flaring device; or (3) direct only low concentration hydrogen sulfide streams to a flaring device and monitor the flaring device with an emissions monitor.  (Pl. Br., p. 2.)  The facility has three hydrocarbon flares that operate in conjunction with each other within a single, continuous flare system: (1) the east flare; (2) the west flare; and (3) the ground flare.  (Pl. Br., p. 3.)

---

[2] Sunoco assumed all obligations except for the Supplemental Environmental Project and the payment of all civil penalties.  (Opp'n, p. 5.)

In May of 2004, after Defendant determined that the existing FGRS was of insufficient capacity, it hired John Zink ("Zink"), an engineering consultant and equipment supplier, to conduct an independent assessment of the facility's flare gas flow. (Opp'n, p. 7.) On July 30, 2004, Defendant provided a Semi-Annual Consent Decree Compliance Report to the Chief of the Environmental Enforcement Section. Id. Defendant reported it had hired Zink and requested an eighteen-month extension of the compliance deadline in the event a new compressor was required.[3] Id. at 8.

After receiving the report from Zink,[4] Defendant wrote to the EPA and the NJDEP notifying them that a new FGRS was in fact needed because the existing FGRS was insufficient to ensure compliance. (Opp'n, p. 9.) On June 2, 2005, the governments denied the request for an extension and subsequently, Defendant wrote a letter to the governments disputing the denial and giving notice of a force majeure situation. Pl. Ex. 1.14 at SUN000356AR. After the governments responded, Defendant filed a Petition with the Court challenging the decision pursuant to the dispute resolution procedures in the Consent Decree. Defendant's proffered reason for failing to eliminate non-emergency flaring was the commercial unavailability of control equipment required to complete the redesign. In the alternative, Defendant claimed a force majeure event. (Pet., p. 30.) As a

---

[3] Defendant estimated the amount of time needed by how long it would take to engineer, design, gain approval for funding, install, commission, and place in normal operation the new FGRS. The new compliance deadline would be December 31, 2006.

[4] Zink concluded that with a capacity of 240,000 SCFM, Defendant could expect to recover only 91% of the flare gas in its system. Pl. Ex. 1.21 at SUN000671AR.

result, the Government filed a Proposed Order to Enforce the Decree and Additional Injunctive Relief.

## II. DISCUSSION

A.  **Standard of Review**

Two standards govern the Court's review of the Petition and Motion to Enforce. As to legal issues, the Court's review is plenary. McDowell v. Philadelphia Hous. Auth., 423 F.3d 233, 238 (3d Cir. 2005). Plenary review requires courts to "discern the scope of a consent decree by examining the language within its four corners." United States v. New Jersey, 194 F.3d 426, 430 (3d Cir. 1999) (quoting Harris v. City of Philadelphia, 137 F.3d 209, 212 (3d Cir. 1998)).

Any factual determinations made by the governments are reviewed for substantial evidence. Consent Decree at ¶ 163. Under the terms of the Consent Decree, the governments' denial of Defendant's request for modifications of the compliance schedule must be reasonable. Id. at ¶ 86. Therefore, the governments bear the burden of proving, with substantial evidence in the administrative record, the reasonableness of their denial. Id. at ¶ 163.

B.  **The Governments Did Not Unreasonably Refuse to Grant Defendant's Request for Modification of the Consent Decree**

Defendant offers two defenses for its failure to comply with the Consent Decree, commercial unavailability and force majeure. The governments denied Defendant's claims, finding that the control equipment was not commercially unavailable and that the

events did not constitute a force majeure event. The governments also argue that the Defendant failed to meet the notice requirements for each of the defenses. Defendant argues that its procedural shortcomings are not a substantial basis for denial and that the governments interpret commercial unavailability more restrictively than the law allows. Defendant also argues that the force majeure defense is not properly before the Court because the dispute resolution proceedings in the Consent Decree have not been invoked.

A consent decree is voluntarily undertaken; therefore, "a party to a consent decree, having made a 'free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment' bears a burden which 'is perhaps even more formidable than had [it] litigated and lost.'" United States v. Wheeling-Pittsburgh Steel Corp., 818 F.2d 1077, 1088 (3d Cir. 1987) (quoting United States v. ITT Cont'l Baking Co., 420 U.S. 223, 236-37 (1975)). The standard for modification of a consent decree is a strict one; the relief is extraordinary and may be granted only upon a showing of exceptional circumstances. Fox v. U.S. Dep't of Hous. & Urban Dev., 680 F.2d 315, 322 (3d Cir. 1982) (quoting Philadelphia Wlfare Rights Org. v. Shapp, 602 F.2d 1114, 1119 (3d Cir. 1979)).

Withholding consent is considered reasonable when: (1) the reason for the extension is insufficient; (2) the event causing the delay was foreseeable by the defendant; and (3) the delay could have been avoided if the defendant acted with due diligence. New York v. Allied-Signal Inc., 987 F. Supp. 137, 142 (N.D.N.Y. 1997).

1. **Force majeure**[5]

The governments argue that Plaintiff has waived its force majeure defense because it failed to raise the defense in its Petition before the Court. Plaintiff argues that it did not waive the defense because it had not invoked the dispute resolution provision of the Consent Decree and was not, therefore, required to raise the issue to the Court in the Petition.

The dispute resolution procedure of the Consent Decree states, in pertinent part:

> The dispute resolution procedure required herein shall be invoked upon the giving of written notice by one of the Parties to this Consent Decree to another advising the other Party of a dispute pursuant to this Section XV. The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute.

Consent Decree at ¶ 161. However, in order to invoke dispute resolution, "the Party making such application has [to have] made a good faith attempt to resolve the matter with the other Party." Consent Decree at ¶ 160.

Specifically, the governments argue that Defendant invoked the dispute resolution procedure by way of its letter of June 3, 2005, which stated:

> [i]f for some reason Paragraph 86 [commercial unavailability] is inapplicable in whole or in part or for some reason does not provide for the requested modification, then the events described above constitute a clear force majeure

---

[5] Force majeure is, "[i]n the law of insurance, [a] superior or irresistible force. Such [a] clause is common in construction contracts to protect the parties in the event that a part of the contract cannot be performed due to causes which are outside the control of the parties and could not be avoided by exercise of due care." Black's Law Dictionary 571 (5th ed. 1979).

(sic) situation triggering Section XIV of the Consent Decree.
Pl. Ex. 1.14 at SUN000358AR. Moreover, the governments argue that Defendant engaged in a "continuing course of conduct throughout and after the informal dispute resolution period that confirmed that <u>force majeure</u> was in dispute," and that it should therefore, be estopped from claiming that the defense was not at issue. (Pl. Br., p. 28.) In support of this argument, the governments point out that Defendant was able to fully present its arguments regarding the <u>force majeure</u> defense.[6]

Finally, the governments also argue that the letter of June 3, 2005, invoked the dispute resolution procedure because it stated that "I hereby give notice to the [g]overnments of a dispute that triggers the Dispute Resolution provisions of Section XV of the Consent Decree." Pl. Br., p. 29. The governments argue that because "[Defendant] did not state that the dispute was limited to Paragraph 86 (commercial unavailability) of the Consent Decree" that it is reasonable to assume that Defendant intended to place both defenses into dispute resolution because the alleged facts and technical conclusions apply to both defenses and because in conclusion, Defendant stated:

> If there is any doubt, Sunoco's <u>position</u> is as follows:
>
> - Sunoco is entitled to modification of the Consent Decree pursuant to Paragraph 86;
>
> - If for some reason Paragraph 86 is inapplicable in

---

[6] The governments argue that Defendant attended a meeting on June 14, 2005; submitted documents in support of the defense; and submitted full briefing.

> whole or in part or for some reason does not provide the requested modification, then the events described above constitute a clear <u>force majeure</u> (sic) triggering Section XIV of the Consent Decree.

<u>Id.</u> at 29 (quoting Pl. Ex. 1.14 at SUN000358AR).  However, the governments ignore the introductory language of Defendant's letter, which stated:

> I write for two reasons.  First, pursuant to Paragraph 161 of the Consent Decree, I hereby give notice to the [g]overnments of a dispute that triggers the Dispute Resolution provisions of Section XV of the Consent Decree.  <u>Second</u>, pursuant to Paragraph 150 of the Consent Decree, I hereby give notice to the [g]overnments of a <u>force majeure</u> situation.

Pl. Ex. 1.14 at SUN000356AR (emphasis added).  The text of Defendant's letter references its letter of January 14, 2005, wherein it put the governments on notice that would be unable to meet the original compliance schedule and also requested a modification of same in accordance with Paragraph 86, commercial unavailability.  Moreover, Defendant characterized the dispute as one where the governments would not agree to the extension insofaras "EPA and DOJ reject any argument that <u>commercial unavailability (Paragraph 86)</u> is [a] basis for any failure by [Sunoco] to comply with the requirements of Paragraph[s] 37 and 38 of the Consent Decree."  <u>Id.</u> at SUN000358AR (emphasis added).

   Defendant argues that its letter of June 3, 2005, did not trigger the dispute

9

resolution procedure outlined above because there was no dispute at that time.[7] Defendant contends that rather than triggering the dispute resolution procedures, the letter of June 3, 2005, served as notice to the governments that Defendant was asserting a <u>force majeure</u> defense under Paragraph 150 of the Consent Decree, and triggered the governments' thirty-day period to evaluate Defendant's claim. Consent Decree at ¶¶ 150, 152. Defendant argues that until EPA rejected its defense by letter of July 5, 2005, there was no <u>force majeure</u> dispute eligible for dispute resolution.[8]

Given the fact that the letter plainly stated that it served two purposes, one of which was to put the government on notice that the dispute resolution procedures had been triggered and one of which was to put the government on notice that Defendant believed it had a <u>force majeure</u> defense, it cannot reasonably be said that the letter of June

---

[7]The parties do not dispute that the letter of June 3, 2005, triggered the dispute resolution procedures of the Consent Decree as to the commercial unavailability defense.

[8]Defendant also argues that any argument regarding <u>force majeure</u> is premature in the absence of a demand by the governments for stipulated penalties. (Opp'n, p. 44.) Defendant states that "[u]nder the Consent Decree, [it] may only petition this Court for resolution of a <u>force majeure</u> claim 'to avoid payment of stipulated penalties.'" <u>Id.</u> (quoting Consent Decree at ¶ 154). However, Defendant's reliance on Paragraph 154 is misplaced. Paragraph 154 states, in pertinent part:

> If the United States, after consultation with NJDEP, does not accept [Sunoco's] claim of a delay or impediment to performance, [Sunoco] must submit the matter to the Court for resolution to avoid payment of stipulated penalties, by filing a petition for determination with the Court. . . .

Consent Decree at ¶ 154. This language does not support Defendant's interpretation that it may only petition the Court after stipulated penalties are sought; rather, it may only avoid stipulated penalties by petitioning the Court.

10

3, 2005 invoked the dispute resolution procedure as to the defense of <u>force majeure</u>. Indeed, none of the communications referenced by the Defendant in its letter of June 3, 2005 rejected, or even mentioned, the <u>force majeure</u> defense.[9]  See Pl. Exs. 1.13, 1.14, 1.15, 1.16, 1.17, 1.18, 1.19.

Moreover, the fact that Defendant was able to present its <u>force majeure</u> arguments to the governments in tandem with the dispute resolution proceedings regarding the commercial unavailability defense in the absence of prior negotiation on the subject does not create an issue of estoppel in light of the fact that the Consent Decree contemplates that the dispute resolution procedure may only be invoked when the parties have made a good faith attempt to resolve the matter.[10]  Therefore, the Court finds that Defendant did not invoke the dispute resolution proceedings of the Consent Decree.  Accordingly, the <u>force majeure</u> defense is not properly before the Court.[11]

---

[9] Notably, the governments' response to Defendant's letter of June 3, 2005, under the section entitled "<u>Notice</u> of <u>Force Majeure</u>," stated that "[t]o [the governments'] knowledge, [Plaintiff] first made a claim of <u>force majeure</u> on June 3, 2005."  Pl. Ex. 1.11 at SUN000348AR (emphasis added).  Moreover, while the governments' letter characterizes the assertion of the commercial availability defense as a "restatement," it characterizes the purpose of Defendant's letter of June 3, 2005 to provide "written Notice of <u>Force Majeure</u>."  <u>Id.</u> at SUN000345AR.

[10] While the issuance of a position letter by the governments regarding the <u>force majeure</u> defense may make the dispute resolution process somewhat less of a surprise, it does not obviate the need to comply with the requirements of the Consent Decree.

[11] In holding that Defendant did not invoke the dispute resolution proceedings, the Court does not reach the argument as to whether Defendant substantially complied with the notice requirements contained in Paragraph 150 of the Consent Decree.  <u>See</u> Consent Decree at ¶¶ 150, 151.

### 2. Commercial unavailability

The governments argue that the defense of commercial unavailability fails, both procedurally and substantively. In support of their substantive arguments, the governments assert that the circumstances giving rise to Defendant's defense do not satisfy the requirements of commercial unavailability.[12] Defendant's argue that the governments' definition of commercial unavailability vitiate the defense itself.

The Consent Decree provides that:

> [Sunoco] shall be solely responsible for compliance with any deadline or the performance of any work described in Section V of this Consent Decree that requires the acquisition and installation of control equipment and/or additives. If it appears that the commercial unavailability of any control equipment or additives may delay [Sunoco's] performance of work according to an applicable implementation schedule, [Sunoco] shall notify EPA and NJDEP of any such delays . . . . EPA, after an opportunity for consultation with the NJDEP, shall not unreasonably withhold its consent to requests for modifications of schedules of implementation if the requirements of this Paragraph are met. . . .

Consent Decree at ¶ 86.

Equipment is commercially available when there exists a "supplier . . . capable of providing the specified product." Edward M. Crough v. Dep't of Gen. Servs. of D.C., 572 A.2d 457, 463 (D.C. 1990). In Crough, the plaintiff argued that the commercial unavailability of a required product was one of the causes of the project's delays. Id. at 461. The plaintiff argued that the roofing material was commercially unavailable because

---

[12] Given the Court's disposition of this argument, it is unnecessary to reach the procedural defects raised by the governments.

the manufacturer requested modifications to the roof design as a condition to providing the required five-year guarantee. Id. The court, in upholding the finding that the roofing material was not commercially unavailable, reasoned "that [the manufacturer] was willing to provide the materials with a five-year guarantee, once its concerns regarding the roof design were met by the [owner's] decision to alter that design." Id. at 464. The court noted that there was a distinction between this situation and one where the supplier refused to sell the required component and that even a temporary refusal to sell the product did not render it commercially unavailable. Id.

Conversely, equipment is considered commercially unavailable when no supplier is either capable or willing to produce the product. In Perry-McCall Const., Inc. v. United States, 46 Fed. Cl. 664, 667, 673 (Fed. Cl. 2000), the parties agreed that steel tubing was commercially unavailable because there was no manufacturer that fabricated it to the specifications required by the contract. Similarly, in Aerodex, Inc. v. United States, 417 F.2d 1361, 1364, 1368 (Fed. Cl. 1969), the court held that a product was commercially unavailable because the supplier refused to sell the required component individually.

In support of its argument that the definition of commercial availability should include a temporal element,[13] Defendant cites U.S. Phillips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179 (Fed. Cir. 2005), and Rogers Corp. v. Arlon, Inc., 855 F. Supp. 560 (D.

---

[13] Defendant argues that "something that is commercially available [is] an item that readily could be obtained (sic), in a form accessible for the use desired, and in the usual stream of commerce." (Pet., p. 31.)

Conn. 1994); however, Phillips and Rogers are inapposite. In Phillips, the plaintiff sought enforcement of a patent against several of its licensees. 424 F.3d at 1182. The defendants asserted the affirmative defense of per se patent misuse, which requires that a showing that, inter alia, the tying arrangement has an anticomeptitive effect in the market for the second product. Id. at 1193-94. The anticompetitive effect can be proved by showing that there is a commercially feasible alternative to the second product. Id. at 1194. The Federal Circuit held that "the mere possibility that alternative technology might at some point become available is not sufficient to support a finding that at the time the [plaintiff's] licenses were executed, there was actually a commercially available alternative to the technology claimed in the [patent in question]." Id. at 1196.[14]

Here, Defendant was able to locate a manufacturer that would fabricate the compressor units; however, there was a lead time of approximately fifty-two weeks. Pl. Ex. 1.19 at SUN000510AR. Because Defendant's supplier was capable and willing to provide the units, consistent with Crough, Perry-McCall and Aerodex, the units were and are commercially available.[15]

Phillips and Rogers are distinguishable from the case at bar. The Phillips Court

---

[14] Defendant states that Rogers holds "that when a material is still 'being tested, evaluated, and developed,' and cannot be placed 'on sale' or 'in public use,' the material is not commercially available." (Def. Op., p. 28 (quoting Rogers, 855 F. Supp. at 566-67).)

[15] This finding by the governments is supported by substantial evidence in the record.

addressed the effect of technology that is not yet developed on the question of commercial availability. Here, the compressor units were not a possibility that might at some point become available, they were a reality. Moreover, unlike the products in Rogers, which were in the research and development phase, the compressor units here were available for sale on the open market. Defendant's have not presented any authority for the proposition that there is a temporal element in the test for commercial availability. But see Franklin E. Penny Co. v. United States, 524 F. 2d 668, 675 (Fed. Cl. 1975) (holding that commercial availability does not extend to the willingness of a supplier to provide the product within a specified time period). Therefore, the Court finds that the governments properly interpreted the term "commercial availability." Accordingly, Defendant is not entitled to relief under Paragraph 86 for the delay caused by the lead time associated with the control equipment.[16]

**C.  Stipulated Penalties**

The governments seek to have this Court reduce to an Order the obligations of the Consent Decree, that is, the requirement that Defendant place into escrow the amount of stipulated penalties that it disputes. By the governments own admissions, Defendant is "likely to," but had not at the time the brief was submitted, dispute its obligation to pay stipulated penalties. The governments submit that "[r]ather than wait until [Defendant]

---

[16] Because the Court finds that the governments correctly interpreted commercial availability, it is unnecessary to reach Defendant's argument regarding the propriety of seeking additional consideration in exchange for an extension of the compliance deadline.

15

formally invokes the dispute resolution provisions of the Consent Decree . . .," this Court should place on the Defendant a burden that neither it nor the governments bargained for under the express terms of the Consent Decree.

Specifically, Paragraph 146 states, in pertinent part, that:

[Sunoco] shall pay stipulated penalties upon written demand by the United States or New Jersey . . . .

Consent Decree at ¶ 146.  Further, Paragraph 147 states, in pertinent part, that:

Should [Sunoco] dispute the [governments'] demand for all or part of a stipulated penalty, it may avoid the imposition of a penalty for failure to pay a stipulated penalty under Paragraph 145 by placing the amount demanded in a commercial escrow account pending resolution of the matter and invoking the dispute resolution provisions of XV within the time provided in Paragraph 146 for payment of stipulated penalties. . . .

Consent Decree at ¶ 147.  Based on the language of the Consent Decree, the Court rejects the governments' invitation to order the Defendant to place money in escrow absent a showing that the Defendant has invoked the relief set forth by Paragraph 147 without having placed the amount demanded in escrow.  Therefore, the governments' motion will be denied to the extent it seeks an order directing Defendant to place a certain sum in escrow.

**D.     Injunctive Relief**

This issue presents the Court with two questions.  First, does the Court have the power to grant the governments injunctive relief.  Second, does the conduct of the Defendant warrant the injunctive relief requested.

16

### 1.     Equitable power

The governments argue that this Court has the power to grant equitable relief pursuant to Paragraph 147 of the Consent Decree, pursuant to the Clean Air Act, and pursuant to this Court's general equitable powers.  Defendant does not seriously dispute the Court's power to issue injunctive relief under the Consent Decree; rather, the Defendant argues that the governments have not alleged a legal basis for the injunctive relief sought.

Paragraph 147 of the Consent Decree reads, in pertinent part:

> The United States and New Jersey reserve the right to pursue any other non-monetary remedies to which they are legally entitled, including but not limited to, injunctive relief for [Sunoco's] violations of this Consent Decree.

Consent Decree at ¶ 147.  Therefore, under the plain language, the Court may award the governments injunctive relief if Defendant violates the Consent Decree.

### 2.     Appropriateness of Injunctive Relief

The governments seek injunctive relief, requiring Defendant to: (1) provide a detailed compliance plan; (2) demonstrate that the plan will result in continuous compliance; (3) identify a schedule that will minimize further delays; and (4) reduce the sulfur dioxide emissions from the Eagle Point Refinery in an amount at least equal to the excess emissions that have been emitted as a result of Defendant's non-compliance with Paragraphs 37 and 38(a).  Defendant argues that the governments have failed to demonstrate that they are legally entitled to such relief, as required by Paragraph 147 of

the Consent Decree. The Court will discuss the four items listed above in two groups: administrative relief, which includes items one, two and three; and punitive relief, which includes item four.

### a. administrative relief

The governments argue that a court order compelling Defendant to provide information relating to the administrative relief set forth above will "expedite the process." Pl. Br., p. 64. Defendant argues that such an order would be duplicative in light of the fact that the governments have already requested the information, and Defendant has completed and submitted its responses to said request. Although the governments' reply indicates that the responses are inadequate, Defendant clarifies its position in its sur-reply and submits that no further information is available as to its compliance plan and schedule. Therefore, it appears that the issue relating to the administrative relief south by the governments is moot. Accordingly, the governments' request for injunctive relief requiring the Defendant to: (1) provide a detailed compliance plan; (2) demonstrate that the plan will result in continuous compliance; and (3) identify a schedule that will minimize further delays, will be dismissed without prejudice to the governments' right to re-file in the event the compliance plan and schedule are unsatisfactory.

### b. punitive relief

The governments argue that a court order requiring Defendant to further reduce

sulfur dioxide emissions as a result of the period of non-compliance will, in essence, promote a cleaner environment. Defendant argues that such relief is not available to the governments under the terms of the Consent Decree.[17] To the extent that the governments wanted the ability to pursue such injunctive relief, i.e., emissions offsets, they should have incorporated it into the penalties section of the Consent Decree. Therefore, absent language in the Consent Decree imposing such a penalty on Defendant, the Court will not read same into it. Accordingly, the governments' motion will be denied to the extent that it seeks injunctive relief requiring Defendant to reduce the sulfur dioxide emissions from the Eagle Point Refinery in an amount at least equal to the excess emissions that have been emitted as a result of Defendant's non-compliance with Paragraphs 37 and 38(a).

### III.  CONCLUSION

Based on the foregoing, Defendant's Petition will be denied and the governments' Motion to Enforce will be granted in part, denied in part and dismissed without prejudice in part.

/S/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
UNITED STATES DISTRICT JUDGE

DATED: August 9th, 2006

---

[17] Defendant also argues that the Clean Air Act ("Act"), upon which the governments rely, does not authorize such emissions offset, and, in any case, the governments did not allege and/or prove a prima facie case of a violation of the Act. (Sur-Reply, pp. 2-7.)